**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| TERRY KATZ )<br><br>        *Plaintiff*,                                )<br>                                                      )<br>vs.                                                   )<br>                                                      )<br>INTEL PHARMA, LLC, a Texas limited )<br>liability company; NTEL PHARMA, LLC, )<br>a Texas limited liability company; )<br>NTEL NUTRA, INC., a Texas corporation; )<br>and LANDON SUGGS, an individual. )<br>                                                      )<br>        *Defendants*.                            )<br>_____ ) | **Case No. 4:18-CV-01347** |

<u>**PLAINTIFF TERRY KATZ'S FIRST AMENDED COMPLAINT**</u>

COMES NOW Plaintiff TERRY KATZ (hereinafter "Mr. Katz"), by and through his undersigned attorneys, and brings this derivative action, on behalf of nominal defendant Intel Pharma, LLC, for breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, violations of the Texas Uniform Fraudulent Transfer Act, and civil conspiracy against Defendants LANDON SUGGS, NTEL PHARMA, LLC, and NTEL NUTRA, INC. (collectively referred to herein as, "Defendants") and alleges as follows:

<u>**INTRODUCTION**</u>

This is a derivative action by the minority owner of an early stage workout supplement startup alleging the misappropriation of corporate assets and the usurpation of future business opportunities by the startup's officers who are also its controlling members. NTel Nutra, Inc. ("NUTRA") markets, produces, and sells various workout supplement products both domestically and abroad. NUTRA's core products include "Arez God of the Gym," a pre workout supplement, and "Alphazine," a post workout supplement. NUTRA is the successor-in-

interest to NTel Pharma, LLC ("N-TEL"), which is no longer operational and previously sold and marketed "Arez God of the Gym" and "Alphazine," in addition to other products NUTRA also now sells.

In early 2015, Landon Suggs ("Mr. Suggs"), then the sole owner of Intel Pharma, LLC ("INTEL"), offered Terry Katz ("Mr. Katz") a 25% ownership interest in INTEL in exchange for startup capital and other in-kind contributions. Mr. Katz accepted the offer, provided the needed capital and in-kind contributions, and obtained a 25% ownership interest in the business. INTEL sold and marketed "Arez God of the Gym" and "Alphazine," in addition to other products later sold by N-TEL and now sold by NUTRA.

In the fall of 2016, Mr. Suggs, INTEL's CEO, and Angel Echevarria ("Mr. Echevarria"), INTEL's president—together, the controlling members of INTEL—directed INTEL to transfer all, or substantially all, of INTEL's assets to a newly formed entity, N-TEL, which they solely owned and controlled. The transfer hollowed out INTEL shutting down its operations. A short time later, Mr. Suggs and Mr. Echevarria transferred all, or substantially all, of N-TEL's assets to another entity, NUTRA, which they also owned and controlled and continue to own and control. As before, N-TEL ceased operations.

In perpetrating the foregoing, Mr. Suggs and Mr. Echevarria breached the fiduciary duties they owed to INTEL and deprived it of any profit earning potential or capability. Instead, INTEL's future profits were diverted to themselves through companies they alone controlled.

## **THE PARTIES**

### 1.

Plaintiff Terry Katz ("Mr. Katz") is a resident of the State of Georgia residing at 910 Deerfield Crossing Drive, Apartment 3114, Alpharetta, Georgia 30004. He is a serial

entrepreneur having created multiple successful nutritional supplement brands and products in both the United States and abroad. Mr. Katz is an owner of INTEL.

2.

Defendant Mr. Suggs is a resident of the State of Texas and may be served at his residence located at 12808 Queensbury Lane, Apartment E317, Houston, Texas 77024. He is the CEO of and managing member of INTEL; the CEO and co-managing member of N-TEL; and the CEO and a director of NUTRA.

3.

Nominal Defendant INTEL is a Texas limited liability company with less than 35 members. Its principal office address was located at 3220 Troup Highway, Suite 160, Tyler, Texas 75701. The Texas Secretary of State forfeited its certificate of formation on January 27, 2017. It may be served with process through its CEO, Mr. Suggs. He may be served at his residence located at 12808 Queensbury Lane, Apartment E317, Houston, Texas 77024.

4.

Defendant N-TEL is a Texas limited liability company. Its principal office address is located at 5604 S. Donnybrook Avenue, Tyler, Texas 75703. It may be served through its registered agent, Mr. Suggs, located at 12808 Queensbury Lane, Apartment E317, Houston, Texas 77024.

5.

Defendant NUTRA is a Texas corporation with its principal office address located at 5829 West Sam Houston Parkway North, Suite 405, Houston, Texas 77041. It may be served through its registered agent, Mr. Suggs, located at 12808 Queensbury Lane, Apartment E317, Houston, Texas 77024.

## JURISDICTION AND VENUE

6.

Pursuant to 28 U.S.C. § 1332, this Court has subject matter jurisdiction over this dispute because the plaintiff and the defendants are citizens of different states and the amount in controversy in this dispute, exclusive of interest and costs, exceeds seventy-five thousand dollars and no cents ($75,000.00).

7.

Though Mr. Katz was, and is, an owner of INTEL, it is an inactive company. As such, the Court should find that, similar to a corporation and its principal place of business, INTEL's citizenship is <u>only</u> that of its state of incorporation (i.e., Texas), and it is <u>not</u> also a citizen of those states in which its other owner-member, Mr. Katz, resides (i.e., Georgia).[1] Alternatively, INTEL is a nominal defendant, against whom no relief is sought in this derivative action, and its citizenship should not be considered for the purpose of assessing diversity pursuant to 28 U.S.C. § 1332.[2] As such, complete diversity exists amongst the parties.

8.

This Court has personal jurisdiction over Defendants because they are either residents of the State of Texas residing in the Southern District of Texas or they are Texas limited liability

---

[1] *See Williams v. Homeland Ins. Co. of N.Y.*, 657 F.3d 287 (5th Cir. 2011) ("[I]nactive corporations remain citizens of their state of incorporation") (quoting *Harris v. Black Clawson Co.*, 961 F.2d 547, 551 (5th Cir. 1992).

[2] *See Lassberg v. Bank of America, N.A.*, 660 Fed. Appx. 262, 266 (5th Cir. 2016); *Marroquin v. Spring Capital Partners, LP*, 2014 WL 4700018, at *1 (S.D. Tx. Sept. 19, 2014) (explaining that the citizenship of nominal defendants "need not be considered in the diversity analysis") (Rosenthal, J.). Further informing this view, Mr. Katz, as shown below, prays that pursuant to TEX. BUS. & COMM. CODE §§ 101.463(c)(1) and (2)  the Court find that justice requires it to treat this derivative action as a direct action and award any recovery by INTEL directly to him.

companies or corporations with their principal places of business located in the Southern District of Texas.

9.

Pursuant to 28 U.S.C. § 1391(b)(1) and (2), venue is proper in the Southern District of Texas because all Defendants reside or are located within the geographical boundaries of this District, and a substantial part of the events or omissions giving rise to Mr. Katz's claims occurred in this District.

## **FACTUAL BACKGROUND**

10.

From this point forward, INTEL will be referred to as the "Company."

### MR. KATZ'S OWNERSHIP IN INTEL PHARMA, LLC

11.

In or around January 2015, Mr. Echevarria, who was at the time COO of Mr. Katz's company, Platinum Labs, introduced Mr. Katz to Mr. Suggs.

12.

In or around February 2015, Mr. Suggs provided Mr. Katz with a Company business proposal describing a workout supplement brand he was developing. At the time, Mr. Suggs was the Company's 100% owner. Among other things, the proposal detailed the Company's objectives, hurdles, and immediate needs.

13.

As indicated in the proposal, and as expressed by Mr. Suggs himself, the Company's immediate needs included, among other things, purchasing initial product inventory, locating warehouse space, and soliciting new accounts to generate sales.

14.

In or around late February or early March 2015, at an in-person meeting in Fort Lauderdale, Florida, Mr. Suggs offered Mr. Katz a 25% ownership interest in the Company in exchange for Mr. Katz funding the purchase of initial product inventory, funding the purchase of product labels, providing warehouse space for the Company's product inventory, and using his contacts in the supplement industry to solicit sales for the Company's new products.

15.

Mr. Katz accepted Mr. Suggs' offer and, in fact, funded the purchase of product inventory and the purchase of product labels. Mr. Katz provided warehouse space for the Company's product inventory, which was also used for shipping and distributing the Company's products. And Mr. Katz used his contacts in the supplement industry to solicit sales for the Company's products.

16.

Subsequent to Mr. Katz's acceptance of the offer, and after his performance pursuant to the oral agreement between he and Mr. Suggs, in written correspondence to Mr. Katz, Mr. Suggs confirmed Mr. Katz's 25% ownership interest in the Company.

17.

Subsequent to Mr. Sugg's written confirmation of Mr. Katz's 25% ownership interest in the Company,   Mr. Echevarria stated in separate written correspondence with commercial insurance broker Carl N. Maranto ("Mr. Maranto"), with Plastridge Insurance Agency, that the owners of the Company were Mr. Suggs, Mr. Echevarria, **and** Mr. Katz.

18.

On information and belief, at the time of Mr. Echevarria's written correspondence with Mr. Maranto, Mr. Echevarria was the president of the Company.

19.

Subsequent to Mr. Suggs' confirmation of Mr. Katz's 25% ownership interest in the Company and Mr. Echevarria's written correspondence above, Mr. Katz received at least two income distributions from the Company in the summer of 2015. He has received no further income distributions from the Company.

20.

On or around August 8, 2015, Mr. Katz wrote Mr. Suggs and Mr. Echevarria and presented an offer for one or both of them to purchase his ownership interest in the Company. Neither Mr. Echevarria nor Mr. Suggs responded to this written offer.

21.

On or around September 10, 2015, Mr. Katz threatened Mr. Suggs and Mr. Echevarria, with legal action if they did not, among other things, respect his ownership interest in the Company and pay any income distributions that were then due and owing.

<u>INTEL PHARMA, LLC TRANSFERS ASSETS TO NTEL PHARMA, LLC AND CEASES DOING BUSINESS</u>

22.

Among other workout supplement products, the Company sold and marketed "Arez God of the Gym," in various flavor combinations, and the product "Alphazine."

23.

On or around January 27, 2017, the Texas Secretary of State forfeited the Company's certificate of formation.

24.

Prior to this forfeiture, on or around August 22, 2016, Mr. Suggs and Mr. Echevarria incorporated N-TEL, a Texas limited liability company.

25.

After N-TEL was incorporated, Mr. Suggs and Mr. Echevarria directed the Company to convey all or substantially all of its assets to N-TEL.

26.

On information and belief, the conveyance or transfer of the Company's assets (e.g., intellectual property, cash, and website) to N-TEL was not an arm's length transaction and lacked adequate consideration.

27.

At the time of the foregoing conveyance from the Company to N-TEL, Mr. Suggs and Mr. Echevarria controlled the Company and N-TEL.

28.

At the time of the foregoing conveyance from the Company to N-TEL, Mr. Suggs was the managing member and CEO of the Company, and the co-managing member and CEO of N-TEL.

29.

At the time of the foregoing conveyance from the Company to N-TEL, Mr. Echevarria was a member and the president of INTEL, and the co- managing member and the president of N-TEL.

30.

At the time of the foregoing conveyance from INTEL to N-TEL, Mr. Suggs and Mr. Echevarria were, together, majority owners of the Company and the sole owners of N-TEL and, if not the sole owners of N-TEL, they were, together, the majority owners of N-TEL.

31.

Immediately following the foregoing conveyance, N-TEL started selling and marketing the same workout supplement products as the Company including, but not limited to, "Arez God of the Gym," in various flavor combinations, and the product "Alphazine."

32.

For a time, N-TEL sold and marketed these products through the Company's own website: "www.intel-pharma.com." Thereafter, the Company's website redirected visitors to N-Tel's websites: "www.ntelpharma.com" and/or "www.ntelnation.com."

33.

N-TEL also used what was the Company's Facebook page to market to, and communicate with, consumers and the public.

34.

Following the foregoing conveyance, the Company ceased selling the foregoing products and ceased conducting business. It has been an inactive company at least as of the date of the foregoing conveyance to N-TEL but no later than January 27, 2017, the date the Texas Secretary of State forfeited its certificate of formation.

35.

The foregoing conveyances from the Company to N-TEL and the subsequent sales of the Company's products by N-TEL, to the exclusion of the Company, resulted in the usurpation of

the Company's future business opportunities, which, in turn, deprived the Company of any ability to generate sales and earn a profit; thus, materially impairing the Company's value as a going concern.

36.

In perpetrating the foregoing, and completely diverting sales and profits from the Company to N-TEL, Mr. Suggs and Mr. Echevarria placed their personal interests before that of the Company, which operated to the detriment of the Company and, by extension, its members.

37.

Prior to, at the time of, and subsequent to the foregoing conveyance, Mr. Katz was—and to this day, is—a member-owner of the Company.

NTEL PHARMA, LLC TRANSFERS ASSETS TO NTEL NUTRA, LLC AND CEASES DOING BUSINESS

38.

Less than 18 months after the incorporation of N-TEL, Mr. Suggs and Mr. Echevarria incorporated NUTRA, a Texas corporation, on or around January 1, 2018.

39.

After NUTRA was incorporated, Mr. Suggs and Mr. Echevarria directed N-TEL to convey all or substantially all of its assets to NUTRA.

40.

On information and belief, the conveyance or transfer of N-TEL's assets (e.g., intellectual property, cash, and website) to NUTRA was not an arm's length transaction and lacked adequate consideration.

41.

On information and belief, the foregoing conveyance rendered N-TEL insolvent and, though it remains identified as active by the Texas Secretary of State, it is no longer conducting business and, practically speaking, is an inactive company.

42.

On information and belief, at the time of the foregoing conveyance from N-TEL to NUTRA, Mr. Suggs and Mr. Echevarria controlled N-TEL and NUTRA.

43.

On information and belief, at the time of the foregoing conveyance from N-TEL to NUTRA, Mr. Suggs and Mr. Echevarria were the sole owners of N-TEL and NUTRA, and, if not, together they owned over 50% of each entity.

44.

At the time of the foregoing conveyance from N-TEL to NUTRA, Mr. Suggs was the co-managing member and CEO of N-TEL, and a shareholder in and the CEO of NUTRA.

45.

At the time of the foregoing conveyance from N-TEL to NUTRA, Mr. Echevarria was a co-managing member and the president of N-TEL, and a shareholder in and the president of NUTRA.

46.

On January 1, 2018, the same day NUTRA was incorporated, NUTRA made the following public announcement via Twitter:

> NTEL Pharma is now NTEL Nutra! We wanted our name to symbolize what we do in a better light. The old name had a habit of confusing potential customers, so we feel it is worth the trouble to make the change.

47.

NUTRA continues to hold itself out as the continuation of N-TEL describing itself to the public and its consumers as "[f]ormerly NTel Pharma."

48.

In other words, despite being a newer separately incorporate entity, NUTRA is merely a continuation of N-TEL.

49.

On January 4, 2018, STACK3D.com, which describes itself as "[t]he premiere source for supplement news . . .[,]" published an article titled "NTel Pharma officially changes its name to NTel Nutra" reinforcing the notion the notion that NUTRA is merely a continuation of N-TEL.

50.

Immediately following the foregoing conveyance from N-TEL, NUTRA started selling and marketing the same products as N-TEL including, but not limited to, "Arez God of the Gym," in various flavor combinations, and the product "Alphazine".

51.

Following the foregoing conveyance to NUTRA, N-TEL ceased selling the foregoing products and ceased conducting business. It has been an inactive company as early as the date of the conveyance to NUTRA.

52.

N-TEL's websites "www.ntelpharma.com" and "www.ntelnation.com" now redirect visitors to NUTRA's website, "www.ntelnutra.com."

53.

Furthermore, NUTRA now uses N-TEL's (formely the Company's) Facebook page to market to, and communicate with, consumers and the public.

54.

Similarly, using social media channels NUTRA regularly markets itself and its products using the hashtags "#intelpharma" and "#ntelnation"—which were used previously at various times by the Company and N-TEL.

55.

NUTRA represents itself to the public using the same "Who We Are" mission statement that N-TEL and the Company previously used:

> We believe in truth. We believe in quality. We believe that in the end, no marketing regime will ever replace the power of a satisfied consumer who BECOMES more than a customer...
>
> We believe in creating a team who shares the same goals and desires for those around us.
>
> At [*Intel Pharma, NTel Pharma,* or *NTel Nutra*][3], you will never hear about the miracles our products work without effort. You will never see claims or statements that breed a false hope inside of consumers, that ultimately will let you down and discourage you. What you WILL hear about, is the TRUTH in what it takes to achieve your goals. As a U.S. Veteran owned and operated company, comradery is a core value that runs deep through the veins of our infrastructure. We believe that the best people to have in your life are those that will say mean things to your face, and great things behind your back.
>
> We will not sell you the miracle pill.
>
> We WILL sell you tools. The most advanced, and powerful tools that we have at our disposal.
>
> We WILL stand behind our products, and strive to be innovators instead of followers.

---

[3] Each entity inserts its name in the bracketed space.

We WILL embody the values that we believe gave us the opportunity to live our dream, and share it with you. Through our products, our story, and our customer service, we hope to recruit you as more than a customer.

We wish to have you join our family.

56.

NUTRA is the successor of N-TEL, having the same management an ownership as N-TEL, having acquired its assets, assumed its liabilities, and continued and carried on the going business of N-TEL.

## COUNT I
## <u>BREACH OF FIDUCIARY DUTY</u>
### (As to Mr. Suggs)

57.

Mr. Katz reiterates and re-alleges each of the allegations set forth in Paragraphs 1—56 as if fully set forth herein verbatim.

58.

Mr. Suggs, as chief executive officer of the Company, owed fiduciary duties of loyalty and care to the Company, which prohibited him from putting his own interests before that of the Company, self-dealing, misappropriating the Company's assets, intellectual property, and future business opportunities for his own use and benefit and required that he be diligent and prudent in managing the Company's affairs.

59.

Mr. Echevarria, as president of the Company, owed fiduciary duties of loyalty and care to the Company, which prohibited him from putting his own interests before that of the Company, self-dealing, misappropriating the Company's assets, intellectual property, and future business

opportunities for his own use and benefit and required that he be diligent and prudent in managing the Company's affairs.

60.

Mr. Suggs and Mr. Echevarria breached their fiduciary duties of loyalty and care when, using N-TEL, they misappropriated the Company's assets and intellectual property and usurped the Company's future business opportunities for their own benefit.

61.

These breaches completely deprived the Company of its ability to generate sales, earn a profit, make distributions to its members, and materially impaired the value of the Company as a going concern.

62.

As a direct and proximate result of these breaches of fiduciary duty, the Company has been financially harmed in an amount to be proved at trial—such amount being not less than $1,000,000.00.

63.

Mr. Suggs acted intentionally and exhibited such willful misconduct as to raise the presumption that he acted with malice.

64.

Accordingly, and pursuant to TEX. CIV. PRAC. AND REM. CODE § 41.001, the Company is entitled to recover exemplary damages from Mr. Suggs in an amount to be determined by the trier of fact.

65.

Pursuant to TEX. BUS. & COMM. CODE §§ 101.463(c)(1) and (2), justice requires that the Court treat this derivative action as a direct action and any recovery by the Company in this proceeding, as to this count, should be paid directly to Mr. Katz.

### COUNT II
### AIDING & ABETTING A BREACH OF FIDUCIARY DUTY
#### (As to N-TEL & NUTRA)

66.

Mr. Katz reiterates and re-alleges each of the allegations set forth in Paragraphs 1—65 as if fully set forth herein verbatim.

67.

Mr. Suggs and Mr. Echevarria owed a duties of loyalty and care to the Company, which prohibited them from putting their interests before the Company's, self-dealing, misappropriating the assets, intellectual property, and future business opportunities of the Company and, generally, depriving the Company of its ability to earn a profit and/or materially impairing the value of the Company as a going concern, and required that they be diligent and prudent in managing the Company's affairs.

68.

N-TEL, through its officers and managing members, Mr. Suggs and Mr. Echevarria, was aware of the fiduciary duties that Mr. Suggs and Mr. Echevarria owed to the Company.

69.

N-TEL colluded in or aided and abetted Mr. Suggs and Mr. Echevarria in the previously described breaches of their fiduciary duties, and it was an active and knowing participant in these breaches.

70.

N-TEL participated in the breaches of these fiduciary duties by Mr. Suggs and Mr. Echevarria for the purpose of advancing its own interests.

71.

N-TEL obtained both direct and indirect benefits from colluding or aiding and abetting Mr. Suggs and Mr. Echevarria's breaches of the fiduciary duties they owed to the Company.

72.

As a direct and proximate result of aiding and abetting the foregoing breaches of fiduciary duties, the Company has been financially harmed in an amount to be proven at trial—such amount being not less than $1,000,000.00.

73.

N-TEL acted intentionally and exhibited such willful misconduct as to raise the presumption that it acted with malice.

74.

Accordingly, and pursuant to TEX. CIV. PRAC. AND REM. CODE § 41.001, the Company is entitled to recover exemplary damages from N-TEL in an amount to be determined by the trier of fact.

75.

NUTRA, as the successor-in-interest to N-TEL, is also liable for the compensatory and exemplary damages resulting from this tortious conduct, jointly and severally with N-TEL.

76.

N-TEL and NUTRA are companies which were, and are, owned and operated by Mr. Suggs and Mr. Echevarria with such continuity of purpose, facilities, commingling of funds and

disregard of the separate identity of each that such operation amounts, and amounted, to one entity thereby imposing liability for the above described compensatory and punitive damages to N-TEL and NUTRA, jointly and severally.

77.

Pursuant to TEX. BUS. & COMM. CODE §§ 101.463(c)(1) and (2), justice requires that the Court treat this derivative action as a direct action and any recovery by the Company in this proceeding, as to this count, should be paid directly to Mr. Katz.

**COUNT III**
**VIOLATIONS OF THE TEXAS UNIFORM**
**FRAUDULENT TRANSFER ACT**
**(As to N-TEL and NUTRA)**

78.

Mr. Katz reiterates and re-alleges each of the allegations set forth in Paragraphs 1—77 as if fully set forth herein verbatim.

79.

The Texas Uniform Fraudulent Transfer Act (TEX. BUS. & COMM. CODE § 24.001, *et seq.*), prohibits transactions designed to defraud, hinder, or delay a creditor from collecting on a debt.

80.

N-TEL violated TUFTA when it transferred, or conveyed, all or substantially all of its assets to NUTRA for no consideration or inadequate consideration.

81.

The foregoing causes of action give rise to claims against  N-TEL within the meaning of TUFTA.

82.

As a result, at the time of the transfers herein described, the Company was a creditor of N-TEL within the meaning of TUFTA.

83.

As a result, at the time of the transfers herein described, N-TEL was a debtor of the Company within the meaning of TUFTA.

84.

By virtue of the commonality of ownership and control alleged above, N-TEL and NUTRA are affiliates of one another within the meaning of TUFTA, or, alternatively, were affiliates with one another at the time of the transfers or conveyance of assets from N-TEL to NUTRA.

85.

The transfers of assets from N-TEL to NUTRA, described above, were made with actual intent to hinder, delay, or defraud the Company as shown by the following:

a) The value of the consideration received by N-TEL from NUTRA was not reasonably equivalent to the value of the assets transferred;

b) N-TEL transferred or conveyed all or substantially all of its assets to NUTRA, an insider of N-TEL within the meaning of TUFTA;

c) N-TEL effectively retained control of its assets after the transfer, because its sole owners are also the owners of NUTRA;

d) On information and belief, N-TEL became insolvent as a consequence of the foregoing transfers to NUTRA.

86.

In light of the foregoing, the Company seeks the following remedies as provided by TEX. BUS. & COMM. CODE § 24.008:

a. Avoidance of the transfers described above to the extent necessary to satisfy the Company's judgment;

b. Attachment of the assets that are the subject of the transfers described above;

c. Execution of the assets transferred or the proceeds therefrom;

d. Attorneys' fees and costs as provided by TEX. BUS. & COMM. CODE § 24.013; and

e. Any other relief the circumstances may require.

87.

Pursuant to TEX. BUS. & COMM. CODE §§ 101.463(c)(1) and (2), justice requires that the Court treat this derivative action as a direct action and any recovery by the Company in this proceeding, as to this count, should be paid directly to Mr. Katz.

## COUNT IV
## CIVIL CONSPIRACY
### (As to Mr. Suggs, N-TEL, and NUTRA)

88.

Mr. Katz reiterates and re-alleges each of the allegations set forth in Paragraphs 1—87 as if fully set forth herein verbatim.

89.

As shown herein, Mr. Suggs and Mr. Echevarria—in breach of their fiduciary duties—and N-TEL conspired and agreed amongst themselves, their employees and agents, and with others unknown to the Company, to misappropriate the Company's assets and, in so doing, usurp the Company's future business opportunities.

90.

As shown herein, Mr. Suggs, Mr. Echevarria, N-TEL, and NUTRA conspired and agreed amongst themselves, their employees and agents, and with others unknown to the Company, to transfer or convey all of N-TEL's assets to NUTRA for no consideration, or nominal consideration, in an effort to defraud the Company—a creditor of N-TEL.

91.

The objects of these conspiracies, as described above, were themselves legal wrongs and amounted to breaches of fiduciary duties owed by Mr. Suggs and Mr. Echevarria to the Company, aiding and abetting of these breaches by N-TEL, and fraudulent transfers by N-TEL and NUTRA—all at the direction of Mr. Suggs and Mr. Echevarria.

92.

The objects of these conspiracies were, in fact, accomplished by Mr. Suggs, Mr. Echevarria, N-TEL, and NUTRA to the injury of the Company.

93.

Such conduct constitutes agreements by, and among, Mr. Suggs, Mr. Echevarria, N-TEL, NUTRA, and others unknown to the Company, to commit unlawful acts, or to commit lawful acts in an unlawful manner as proscribed by law.

94.

Mr. Suggs, N-TEL, and NUTRA are jointly and severally liable to the Company for their actions in conspiring as described above.

95.

As a proximate result of this conspiracy, the Company has been financially harmed in an amount to be proven at trial—such amount being not less than $1,000,000.00.

96.

In conspiring, as described above, Mr. Suggs, N-TEL, and NUTRA acted intentionally and exhibited such willful misconduct as to raise the presumption that each acted with malice.

97.

Accordingly, and pursuant to TEX. CIV. PRAC. AND REM. CODE § 41.001, the Company is entitled to recover exemplary damages from Mr. Suggs, N-TEL, and NUTRA jointly and severally, in an amount to be determined by the trier of fact.

98.

Pursuant to TEX. BUS. & COMM. CODE §§ 101.463(c)(1) and (2), justice requires that the Court treat this derivative action as a direct action and any recovery by the Company in this proceeding, as to this count, should be paid directly to Mr. Katz.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Terry Katz respectfully requests that this Court enter judgment as follows:

(1) For judgment in favor of Plaintiff and against Mr. Suggs, N-TEL, and NUTRA in such amount as to be shown by the evidence at trial;

(2) Awarding to the Company money damages against Mr. Suggs, N-TEL, and NUTRA, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein;

(3) Awarding to the Company restitution from Mr. Suggs and ordering disgorgement of all profits, benefits and/or other compensation he obtained as a result of the acts and transactions complained of herein;

(4) Specifically, as to Count IV:

a.   Avoidance of the transfers described therein to the extent necessary to satisfy the Company's judgment;

b.   Attachment of the assets that are the subject of the transfers described therein;

c.   Execution of the assets transferred or the proceeds therefrom;

d.   Attorneys' fees and costs; and

e.   Any other relief the circumstances may require.

(5)   For all willful acts with malice, punitive damages as the Court may allow;

(6)   For a finding by the Court pursuant to Tex. Bus. Code. § 101.463(c)(1) that justice requires this derivative action to be treated as a direct action brought by Mr. Katz for Mr. Katz's own benefit;

(7)   For a finding by the Court pursuant to Tex. Bus. Code. § 101.463(c)(2)  that justice requires any recovery by the Company in this proceeding to be paid directly to Mr. Katz.

(8)   For an award of attorneys' fees and costs as determined by the Court; and

(9)   For all such other relief as this Court deems fair and equitable under these circumstances.

Respectfully submitted, this 20th day of July 2018.

KAUFMAN & FORMAN, P.C.

/s/ Matthew D. Treco
Matthew D. Treco
Georgia Bar No. 802181*
8215 Roswell Road, Building 800
Atlanta, Georgia 30350-6445
T: (770) 390-9200
F: (770) 395-6720
mdt@kauflaw.net
*Counsel for Plaintiff*
*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day electronically filed **PLAINTIFF TERRY KATZ'S FIRST AMENDED COMPLAINT** with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all attorneys of record in this matter:

Robert Tauler
TAULER SMITH, LLP
626 Wilshire Boulevard, Suite 510
Los Angeles, California 90017
rtauler@taulersmith.com
*Counsel for Defendants*

Kent Altsuler
LEWIS BRISBOIS BISGAARD & SMITH LLP
24 Greenway Plaza, Suite 1400
Houston, Texas 77046
Kent.Altsuler@lewisbrisbois.com
*Counsel for Plaintiff*

This 20th day of July, 2018.

KAUFMAN & FORMAN, P.C.

/s/ Matthew D. Treco
Matthew D. Treco
Georgia Bar No. 802181*
8215 Roswell Road, Building 800
Atlanta, Georgia 30350-6445
T: (770) 390-9200
F: (770) 395-6720
mdt@kauflaw.net
*Counsel for Plaintiff*
*Admitted Pro Hac Vice