United States District Court
Southern District of Texas
**ENTERED**
April 22, 2019
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TERRY KATZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-18-1347 |
| | § | |
| INTEL PHARMA, NTEL PHARMA, LLC, | § | |
| NTEL NUTRA, INC., | § | |
| and LANDON SUGGS. | § | |
| | § | |
| Defendants. | § | |

**OPINION AND ORDER**

This case arises out of the nutritional supplement industry. Terry Katz brought this derivative action on behalf of the nominal defendant, Intel Pharma, LLC, against Ntel Pharma, LLC, Ntel Nutra, Inc., and Landon Suggs. (Docket Entry Nos. 1, 18). Katz asserts breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, violations of the Texas Uniform Fraudulent Transfer Act, and civil conspiracy. (*Id.*). Katz moves to add a party, alleging that he uncovered it as an entity that played a role in improperly transferring Katz's interest in Intel Pharma to Ntel Pharma and Ntel Nutra. (Docket Entry No. 39). The defendants move for partial summary judgment, arguing that Katz has no ownership interest in Intel Pharma and that they did not have an oral or other contract with Katz to sell him an interest in that company. (Docket Entry No. 48). After a careful review of the pleadings; the motions, responses, and replies; and the applicable law, the court grants Katz's motion to add a party and denies the defendants' motion for partial summary judgment. The reasons for these rulings are explained in detail below.

1

I.     **Background**

In January 2015, Angel Echevarria was working for a company Katz owned, Platinum Labs, as the Chief Operating Officer. Echevarria hired Landon Suggs to work for Platinum Labs on a commission basis. Echevarria introduced Suggs to Katz. (Docket Entry No. 49-2 at 16, 19; Docket Entry No. 50-1 at 10:¶ 7; Docket Entry No. 48-2 at 5). Suggs was then the only owner of Intel Pharma, which he had formed in October 2014. (Docket Entry No. 48-3).

In February 2015, Suggs emailed Echevarria a business proposal to market a workout supplement that Suggs had developed for Intel Pharma. (Docket Entry No. 48-1 at 4; Docket Entry No. 48-2 at 3). Echevarria forwarded the email to Katz. (Docket Entry No. 50-1 at 17–19; Docket Entry No. 48-2 at 3). The proposal listed start-up expenses, including $30,000 for initial inventory, $4,000 for advertising, $800 for brochures, and $200 for stationary and business cards. (Docket Entry No. 48-7 at 12). Suggs proposed that Intel Pharma form "an operating partnership with Platinum Labs" and asked to provide Katz information about the "profitable market potential of adding Intel Pharma to [Platinum Labs's] list of products." (*Id.* at 7, 8).

On February 10, 2015, Suggs and Katz met in Florida. (Docket Entry No. 48-1 at 7). According to Katz, Suggs asked him to invest in Intel Pharma to allow that company to buy initial product inventory, product labels, and warehouse space to sell and distribute its new supplements. (Docket Entry No. 48-1 at 7–8). Katz alleged in his amended complaint that he and Suggs reached an agreement during that Florida meeting for Katz to invest in Intel Pharma. (Docket Entry No. 18 at ¶¶ 14–15). Katz testified in his deposition that in a phone conversation later in February 2015, Suggs offered him a 25% stake in Intel Pharma in return for his investment. (Docket Entry No. 48-1 at 5). Katz testified that he accepted that offer during the telephone call, forming an enforceable oral

contract. (*Id.* at 7).

According to Katz, he began fulfilling his obligations under the oral contract shortly after that telephone call. Katz authorized Platinum Labs to make payments on February 23 and March 12 for $3,531.25 and $3,545.25, respectively, to RS Distribution, to invest in Intel Pharma's inventory. (Docket Entry No. 50-1 at 32–34). Katz testified that he paid Intel Pharma's suppliers $4,441.29 for labels, and provided warehouse space for Intel Pharma, although he was unable to specify how much space. (*Id.* at 36–44; Docket Entry No. 48-1 at 26:1-14). The receipts for the labels show that the cost was billed to Intel Pharma and Platinum Labs. (Docket Entry No. 50-1 at 36, 38, 40). The record is unclear as to whether Katz shared his industry contacts, but Katz argues that he got in touch with his contacts in Northern Ireland about Intel Pharma's new supplement. (*See* Docket Entry No. 48-1 at 9–13). Katz did not pay for Intel Pharma's stationery, business cards, brochures, or advertising, and it is unclear if he paid the full cost of Intel Pharma's initial inventory. (*Id.* at 13–14).

Suggs, Katz, and Echevarria communicated during 2015 about Intel Pharma. On March 10, Suggs texted Katz about Intel Pharma's "current team" structure, writing:

> Myself [Landon Suggs] - CEO - 50%
> Terry [Katz] - COO - 25%
> Angel [Echevarria] - President - 25%

(Docket Entry No. 50-1 at 56). Suggs asked for Katz's opinion on the current structure and whether another party should be allowed to buy into Intel Pharma "at an attainable equity amount up to 25%" that "would . . . come equally out of" Katz's, Echevarria's, and Sugg's interests. (*Id.*).

On March 15, Echevarria shared a screenshot of his text conversation with Suggs, showing that Suggs had proposed a $1,000 profit distribution for the three partners. (*Id.* at 72). In a March

3

23 email, Echevarria informed an insurance company that Katz, Suggs, and Echevarria were Intel Pharma's owners. (Docket Entry No. 50-1 at 60). Echevarria exchanged text messages with Katz on March 24 discussing whether Katz was "ready for a second income" after Intel Pharma sent an email to distributors about Intel Pharma. (*Id.* at 68). On April 1, Echevarria and Katz exchanged text messages discussing whether they would get commissions or a share of profits for Sugg's future international sales. (*Id.* at 70). In April, Katz texted Suggs asking whether he had informed a business lead that Katz was "part of Intel." Suggs replied that he had. (*Id.* at 66). On May 15, Echevarria texted Katz that Echevarria, Katz, and Suggs would be "on [Intel's] payroll" that month after "settl[ing] up with" Suggs. Echevarria included a screenshot of a text conversation with a contact named "Landon," explaining that for the "[f]irst month[,] we put ourselves on $1k a month each and mild 'expenses' . . . [and a]ny profits after will be distributed to the partners based on percentage." (*Id.* at 74). Katz received a $1,000 cashier's check later in May. (*Id.* at 76). The summary judgment evidence does not make clear who wrote the check or what it was for. (*See id.*).

On August 8, 2015, Katz emailed Suggs and Echevarria about the possibility of selling his interest in Intel Pharma. (*Id.* at 80–83). Katz "believe[d] initially [his] offerings to the business [were] a final contribution . . . that paid for a few of the initial orders," but instead, his "business also housed Intel Pharma," he had an employee working for Intel Pharma, and he "shar[ed] . . . sales people and other business resources" with Intel Pharma. (*Id.* at 81). Katz sent a second email on August 13, noting that Echevarria and Suggs had not responded to the first email. (*Id.* at 80).

In April 2018, Katz filed this suit against Intel Pharma, Ntel Nutra, Ntel Pharma, and Suggs. He amended his complaint in July 2018. (Docket Entry Nos. 1, 18). The amended complaint alleges that Suggs and Echevarria formed Ntel Pharma a year after Katz emailed them about selling them

his ownership interest in Intel Pharma. Katz alleges that Suggs and Echevarria transferred all or substantially all of Intel Pharma's assets to Ntel Pharma and that they used Ntel Pharma to sell and market the same workout supplements as Intel Pharma was selling, including, for a time, through Intel Pharma's website and Facebook page. (*Id.* at ¶¶ 24–25, 31–32). Later, according to the amended complaint, the Intel Pharma website redirected customers to Ntel Pharma's websites. (*Id.*). Intel Pharma stopped selling its products or doing business, and, in January 2017, the Texas Secretary of State forfeited the certificate of formation. (*Id.* at ¶ 34).

Katz alleges that Suggs and Echevarria formed a third company, Ntel Nutra, in January 2018, and that they transferred substantially all of Ntel Pharma's assets to Ntel Nutra. Katz alleges that Ntel Nutra described itself as a continuation of Ntel Pharma. Ntel Nutra sold the same supplements and used the same hashtags and marketing features that Intel Pharma and Ntel Pharma had. (*Id.* at ¶¶ 46–55). Katz contends that Suggs and Echevarria were the majority owners, and possibly the sole owners, of Ntel Nutra. (*Id.* at ¶ 43).

Katz now seeks to add another defendant, True Valor Ventures, LLC. (Docket Entry No. 39). Katz argues that discovery revealed that True Valor, which has "no public presences or image," was "the entity that accepts payments from customers of the" other defendant companies, Ntel Pharma and Ntel Nutra. (*Id.* at 1). Katz also argues that True Valor: (1) contracts with and pays the vendors and manufacturers for Ntel Pharma and Ntel Nutra; (2) transfers money to Ntel Pharma and Ntel Nutra; and (3) is "the effective operating entity through which the [Ntel Pharma and Ntel Nutra] have conducted . . . business and manage their financial affairs." (*Id.* at 1–2). The defendants respond that Katz has not shown good cause to amend after the deadline and that an amendment would prejudice them. (Docket Entry No. 45).

5

The defendants move for partial summary judgment that Katz had no ownership interest in Intel Pharma because Katz did not, as he alleges, have an oral contract with Suggs and Echevarria that gave him an interest in Intel Pharma. (Docket Entry No. 48). Katz contends that there are genuine factual disputes material to determining whether he had an ownership interest in Intel Pharma, precluding summary judgment. (Docket Entry No. 50).

## II. The Legal Standards

### A. Rules 15(a) and 16(b)

Federal Rule of Civil Procedure 15(a) provides that a party may amend its pleadings once before a responsive pleading is served. FED. R. CIV. P. 15(a). A party may also amend its pleadings by leave of court or by written consent of the adverse party. *Id.* This rule "enable[s] a party to assert matters that were overlooked or were unknown a the time he interposed the original complaint or answer." 3D CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1473. A party may make a Rule 15(a) amendment to add a party to an action. 6 WRIGHT & MILLER § 1463.

Under Rule 15, courts should "freely give leave [to amend] when justice so requires." FED. R. CIV. P. 15(a). However, the Rule 16(b) "good cause" standard, rather than the "freely given" standard of Rule 15(a), governs a motion to amend filed after the deadline set in the scheduling order. *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 551 (5th Cir. 2010). At that point, only when the moving party has shown good cause does Rule 15(a) apply. *S&W Enters. v. Southtrust Bank of Ala.*, 315 F.3d 533, 536 (5th Cir. 2003) ("We take this opportunity to make clear that Rule 16(b) governs amendment of pleadings after a scheduling order deadline has expired. Only upon the movant's demonstration of good cause to modify the scheduling order will the more liberal standards

6

of 15(a) apply to the district court's decision to grant or deny leave."). This good-cause standard focuses on the diligence of the moving party. *Id.* at 535. To demonstrate good cause, the movant must show that, despite diligence, the movant could not have reasonably met the scheduling deadline. 6A WRIGHT & MILLER § 1522.1 at 231 (2d ed. 1990). Courts consider four factors in deciding if there is good cause: "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *Sw. Bell Tel. Co. v. City of El Paso*, 346 F.3d 541, 546 (5th Cir. 2003) (quotation marks and citations omitted).

### B.  Summary Judgment

"Summary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting FED. R. CIV. P. 56(a)). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Id.*

(quotation marks omitted); *see also Celotex*, 477 U.S. at 325. Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

"Once the moving party [meets its initial burden], the non-moving party must 'go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *Nola Spice*, 783 F.3d at 536 (quoting *LHC Grp.*, 773 F.3d at 694). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008); *see also Nola Spice*, 783 F.3d at 536.

### III. Analysis

#### A. The Motion for Leave to Add True Valor as a Party

8

Under this court's August 2018 scheduling order, the deadline to amend pleadings was September 14, 2018. After that date, "[p]arties filing motions" were required to " show good cause." (Docket Entry No. 23).

The defendants assert that Katz has not shown good cause to grant an untimely motion, and that his proposed amendment would result in "undue delay in this matter and prejudice to the defendants. (Docket Entry No. 45). The defendants argue that Katz could have moved to amend months earlier because True Valor is "a limited liability company registered with the Secretary of the State of Texas with Mr. Suggs, nonparty Angel Echevarria, and nonparty Malorie Attaway publicly named as managers," and "that Mr. Katz was aware of [True Valor] at least by August 2018." (*Id.* at 6). The defendants argue that allowing the proposed amendment to add True Valor as a party will prejudice them because "it will complicate and possibly delay resolution of [their] motion for summary judgment on the issue of ownership," (*id.*), and prolong the litigation by triggering "even more invasive and expansive discovery that will have no bearing on the key issue in the case." (*Id.* at 7).

Katz admits that he was aware of True Valor before he moved for leave to amend his complaint. He argues that he did not know that True Valor was associated with Intel Pharma until some discovery had occurred. (Docket Entry No. 47 at 1). Katz notes that public records show that Suggs and Echevarria are associated with other entities and that the defendants' argument suggests that Katz "should have sued each and every one of these [other] entities at the outset" and added True Valor as a party because they could have been involved with Intel Pharma. (*Id.*). Katz argues that the timing of his motion is not "a product of bad faith or dilatory motive," but shows his need for discovery before he could properly seek to add True Value as a party. (Docket Entry No. 39 at

9

6). Katz claims that he first received documents indicating that True Valor, "an entity with no public presence and "not named on any invoices that have been produced by retail customers," should be added as a defendant on December 18, 2018, only a few weeks before he moved for leave to amend. (*Id.* at 4). Katz asserts that because "True Valor has no public-facing image nor are any of the products sold under its name," and because the defendants did not disclose "financial statements or other summary records setting forth sales, expenses, and profits," discovery was necessary to show True Valor's role. (*Id.* at 3, 6). Katz points out that although the discovery showed that True Valor pays most of Ntel Nutra's expenses, the defendants' product labels, packaging, and advertising do not mention True Valor, and the defendants have not produced documents authorizing True Valor "to sell their goods or to collect sales and pay expenses on their behalf." (*Id.* at 6).

Good cause is shown under Rule 16 when a party moves to amend on the basis of information revealed during discovery. *Parker*, 204 F.3d at 340 (upholding the district court's grant of leave to amend because the dates learned during discovery were necessary to form a sufficient pleading); *Udowa v. Plus4 Credit Union*, No. H–8-3054, 2010 WL 1169963, at *2–3 (S.D. Tex. Mar. 23, 2010) (granting leave to amend to add claim based on deposition testimony). Katz moved to amend three weeks after receiving subpoenaed bank records revealing that True Valor is "the entity that actually collects the overwhelming majority of the funds generated by the sale of Defendant Entities' products." (Docket Entry No. 39 at 4). Katz has shown good cause. His motion for leave to amend and to add True Valor as a party, (Docket Entry No. 39), is granted.

B.  **The Motion for Partial Summary Judgment**

Key to the defendants' motion for partial summary judgment is whether the they have shown that, based on undisputed facts in the record, and as a matter of law, Katz did not have an ownership interest in Intel Pharma. Katz responds that he gained the ownership interest through an oral contract with Suggs, and that his summary judgment evidence at a minimum shows genuine factual disputes material to determining whether he had an interest in Intel Pharma.

Under Texas law, a valid and binding contract requires: "(1) an offer, (2) acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding." *Thornton v. Dobbs*, 355 S.W. 3d 312, 316 (Tex. App.—Dallas 2011, no pet.). "The elements of written and oral contracts are the same and must be present for a contract to be binding." *Id.* The court must examine the parties' communications and "the acts and circumstances surrounding the communications." *Id.* "The determination of a meeting of the minds, and thus offer and acceptance, is based on the objective standard of what the parties said and did and not on their subjective state of mind." *Copeland v. Alsobrook*, 3 S.W.3d 598, 604 (Tex. App.—San Antonio 1999, pet. denied). "It is not enough that one party thinks there was a contract; they must show that their intentions to contract were expressed in a manner that the court is capable of understanding." *Id.* at 605.

1.  **The Formation of the Oral Contract**

The first question is whether Katz and Suggs formed a contract to provide Katz an ownership interest in Intel Pharma. Katz originally alleged that he entered into the oral contract with Suggs at the meeting in Florida. (*See* Docket Entry No. 18 at ¶¶ 14–15). Katz testified that Suggs made a "definite proposal, an ask," at their Florida meeting, but that there was "further work that needed

11

to be done" agree on to the percentages of ownership and money to be paid under the contract. (Docket Entry No. 48-1 at 4). These terms were allegedly finalized during a phone call with Suggs on February 16 or 17. (*Id.* at 5).

Suggs argues that because Katz cannot explain where and when the parties formed the oral contract to sell Katz an interest in Intel Pharma, no enforceable contract exists. (Docket Entry No. 48 at 14). A court may infer a contract through the parties' conduct and course of dealing. *See Harrison v. Williams Dental Grp., P.C.*, 140 S.W.2d 912, 916 (Tex. App.—Dallas 2004, no pet.). Katz has pointed to summary judgment evidence showing that he paid suppliers for initial product inventory and labels for Intel Pharma, and that Suggs accepted that payment. (*See* Docket Entry No. 50 at 12–13). Katz has also pointed to summary judgment evidence—including the text message from Suggs identifying Katz as Intel Pharma's COO with a 25% interest—suggesting that by March 2015, Suggs regarded Katz as having an ownership interest in the company and described him as an owner to others. (*See* Docket Entry No. 50-1 at 56). This conduct supports a reasonable inference that the parties had a contract that gave Katz an ownership interest in Intel Pharma. Whether the alleged offer was accepted in Florida or over the phone after the Florida meeting is not dispositive to whether this contract existed. The summary judgment evidence shows genuine factual disputes material to determining whether Katz and Suggs had an oral contract under which Katz had an ownership interest in Intel Pharma.

    2.  **Whether the Contract's Terms Were Sufficiently Definite**

The defendants argue that Katz had no ownership interest in Intel Pharma because, even if the parties made an oral contract, its terms were too indefinite to be enforceable. (Docket Entry No. 48 at 13–20). "It is well established that the terms of an oral contract must be clear, certain, and

definite." *Gannon v. Banker*, 830 S.W.2d 706, 709 (Tex. App.—Houston [1st Dist.] 1992, writ denied). "A lack of definiteness in an agreement may concern the time of performance, the price to be paid, the work to be done, the service to be rendered or the property to be transferred." *Id.* at 709; *see also Liberto*, 441 F.3d at 324. Texas law favors finding a valid contract, but a court may not create a valid contract if it does not exist. *Lamajak*, 230 S.W.3d at 793.

Whether an agreement is too vague to be enforceable is a question of law. *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex. 1992); *Playoff Corp. v. Blackwell*, No. 2-06-249-CV, 2008 WL 5194340, at *3 (Tex. App.—Fort Worth Dec. 11, 2008, no pet.). "In order to be legally binding, a contract must be sufficiently definite in its terms so that a court can understand what a promisor understood." *T.O. Stanley*, 847 S.W.2d at 221; *see also Lamajak, Inc. v. Frazin*, 230 S.W.3d 786, 793 (Tex. App.—Dallas 2007, no pet.) ("For an enforceable contract to exist, the legal obligations and liabilities of the parties must be sufficiently definite."); *Playoff Corp.*, 2008 WL 5194340, at *3 ("If an alleged agreement is so indefinite as to make it impossible for a court to fix legal obligations and liabilities of the parties, it cannot constitute an enforceable contract."). The material terms of the contract must be agreed to before a court can enforce the contract, and "[w]here an essential term is open for future negotiation, there is no binding contract." *T.O. Stanley*, 847 S.W.2d at 221; *Lamajak*, 230 S.W.3d at 793 ("The contract must be certain and clear as to all essential terms or the contract will fail for indefiniteness."). "'The material terms of a contract are determined on a case-by-case basis.'" *Fischer v. CTMI, LLC*, 479 S.W.3d 231, 237 (Tex. 2016) (citing *McCalla v. Baker's Campground, Inc.*, 416 S.W.3d 416, 418 (Tex. 2013)).

The defendants argue that the alleged oral agreement is indefinite as to the amount of money Katz had to contribute, what Katz's nonmonetary obligations would be, and which entities or

13

individuals would be bound. (Docket Entry No. 48 at 13–20). According to the defendants, Katz has not pointed to competent summary judgment evidence showing an enforceable oral contract because "the contract he alleges contained no terms regarding the amount of money he was obligated to contribute in exchange for his ownership interest," and the parties did not attach definite terms to what his nonmonetary obligation would be in exchange for his interest in Intel Pharma. (Docket Entry No. 48 at 15).

When asked about the contract terms, Katz testified that he would have a 25% ownership stake in Intel Pharma, while Suggs would have a 50% interest and Echevarria the remainder. (Docket Entry No. 48-1 at 5). Katz testified that, in exchange for this 25% ownership interest, he would finance 500 units of initial product, provide warehouse space, and share his industry contacts. (*Id.* at 5–6). While the precise amount Katz would contribute was not specified, he agreed to pay "whatever the products were going to cost for the first run." (*Id.* at 5). Katz argues that his performance, including paying for product and labels, supply sufficiently definite material terms. (Docket Entry No. 50 at 16).

Although the price to be paid is generally a material term for contracts under Texas law, courts have found that tendering performance is sufficiently definite for enforcement. *See Yazdani-Beioky v. Sharifan*, 550 S.W.3d 808, 828 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (citing *Fischer*, 479 S.W.3d at 240) (an oral agreement may be sufficiently definite even though there are missing terms because the party tenders performance). Katz has identified summary judgment evidence showing that Platinum Labs paid $3,531 for Intel Pharma's inventory on February 23, 2015; $3,545 for Intel Pharma's remaining initial product inventory cost; and $2,702 for Intel Pharma's product labels. (Docket Entry No. 50-1 at 32–34, 36–49). Katz also testified that

14

he shared his industry contacts with Suggs by selling Intel Pharma products to his contacts in Northern Ireland, and that he stored Intel Pharma products in his warehouse. (*Id.* at 12, 14). The summary judgment evidence supports a reasonable inference that Katz performed, either partially or fully, under the terms of the oral contract he alleges he had with Suggs.

The defendants do not contend that Katz's performance was defective or insufficient. Instead, they argue that Katz paid for Intel Pharma's inventory and labels to satisfy other obligations, not to perform the alleged oral contract to obtain an ownership interest in Intel Pharma. The defendants contend that Katz's payments were back pay for Suggs's work at Platinum Labs. (Docket Entry No. 48 at 8; Docket Entry No. 48-2 at 5). The defendants also assert that Katz's payments were reimbursed through the $1,000 distributions he received in 2015. (Docket Entry No. 48 at 11 n.5). The defendants have submitted Suggs's deposition to support these arguments. (*See id.*).

Katz responds that it would not be possible for Suggs's Platinum Labs commission check to be that large, based on Platinum Labs's national sales. (Docket Entry No. 50 at 10). Katz argues that his payment for the initial inventory was consideration for his ownership interest in Intel Pharma. Katz points to his text messages with Echevarria stating that Katz would receive a $1,000 distribution each month for his work for Intel Pharma. (Docket Entry No. 50-1 at 72). This record evidence at a minimum shows factual disputes material to determining whether the parties had a valid oral contract.

The defendants argue that the alleged oral contract is indefinite as to Katz's ongoing duties to Intel Pharma. In a text message sent on March 1, 2015, Katz asked Echevarria whether Katz was "going to be part of" Intel Pharma. (Docket Entry No. 48-1 at 15; Docket Entry No. 48-6 at 4). When asked at his deposition what he meant, Katz testified that he wanted to know whether he was

"going to be a part of Intel [Pharma's] day-to-day" operations. (Docket Entry No. 48-1 at 15–16). Katz argues that this discussion shows a "genuine factual dispute which is not ripe for resolution at this stage," because how Intel Pharma operated on a daily basis is distinct from whether the parties had an oral contract for Katz to receive a 25% ownership interest in Intel Pharma. According to Katz, "there were no continuing negotiations for [him] receiving a 25% ownership interest in" Intel Pharma. (Docket Entry No. 50 at 17).

Whether the oral contract specified Katz's day-to-day responsibilities is not dispositive. In *Knowles v. Wright*, 288 S.W.3d 136 (Tex. App.—Houston [1st Dist.] 2009, pet. denied), the plaintiff argued in response to a motion for summary judgment that, because the defendant had 20 years of experience in the oil and gas industry, it was not necessary for the parties to spell out the plaintiff's day-to-day activities in their alleged oral contract. *Id.* at 144. The court agreed that an oral contract to "build a business" for the stated goal of "monetiz[ing] investments" would "not necessarily need to specify [the parties'] day-to-day duties." *Id.* But the court affirmed the trial court's grant of summary judgment to the defendant, concluding that there was no genuine factual dispute material to determining that no enforceable oral contract existed because "the purported oral agreement provided no terms as to [the plaintiff's] specific obligations, i.e., exactly what was required of [the plaintiff] so that [the defendant] could enforce the contract against [the plaintiff]." *Id.* In contrast to the plaintiff in *Knowles*, Katz has pointed to competent summary judgment evidence showing that he performed his obligations under the alleged oral contract, and that Suggs and Echevarria represented to others that Katz had an ownership interest in the company. The oral contract did not need to outline Katz's day-to-day responsibilities to avoid indefiniteness.

The defendants also argue that they are entitled to summary judgment on the ownership issue

16

because the alleged oral contract is indefinite as to "whether it is [Katz], in his individual capacity, or [Platinum Labs,] that allegedly contracted for ownership in Intel Pharma." (Docket Entry No. 48 at 19). Katz responds that the parties' conduct in 2015 resolves "any uncertainty and supplies any omissions claimed by [the] Defendants." (Docket Entry No. 50 at 12). Katz has pointed to competent summary judgment evidence showing that Echevarria represented to third parties that Katz, not Platinum Labs, was a partner in Intel Pharma, and that Echevarria's and Suggs's conduct was consistent with Katz having an ownership interest in Intel Pharma. (Docket Entry No. 50-1 at 56, 59–62, 97–99).

The text messages and emails to third-parties from Suggs and Echevarria refer to Katz's interest in Intel Pharma and show Katz's involvement in that company. The payment records show that Katz, through Platinum Labs, invested money in Intel Pharma in 2015. The defendants have not identified summary judgment evidence or a legal argument that undermines Katz's evidence. The parties' different interpretations of the summary judgment evidence instead shows that there are genuine factual disputes material to determining whether Katz had an ownership interest in Intel Pharma.

## IV.   Conclusion

Katz's motion to add True Valor as a party, (Docket Entry No. 39), is granted. The defendants' motion for partial summary judgment, (Docket Entry No. 48), is denied.

SIGNED on April 19, 2019, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge